UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>*This Amended Complaint relates to:*<br><br>*Howard Center, Inc. v. Johnson & Johnson,* et al., 1:19-op-46010 | MDL 2804<br><br>Case No. 1:17-md-2804<br><br>Hon. Dan Aaron Polster |

**HOWARD CENTER, INC., a 501(c)3 nonprofit organization,**
**Plaintiff,**

**v.**

**JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN CORPORATION; AMERISOURCEBERGEN DRUG CORPORATION; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; ALLERGAN FINANCE, LLC f/k/a ACTAVIS, INC. f/k/a WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.; MALLINCKRODT, PLC; MALLINCKRODT, LLC; CVS HEALTH; WALGREENS BOOTS ALLIANCE, INC. as the successor-in-interest to Rite Aid Corporation; and WALMART, INC. f/k/a WAL-MART STORES, INC.,**

**Defendants.**

**<u>JURY TRIAL DEMANDED</u>**

## AMENDED COMPLAINT

Comes now the Plaintiff, HOWARD CENTER, INC., a Vermont not-for-profit corporation, (hereinafter referred to as "HOWARD CENTER"), on its own behalf and on behalf of its subsidiaries, by and through its attorneys, and files suit against the Defendants and would show as follows:

## INTRODUCTION

1. The addiction epidemic of prescription opioid abuse in the United States has caused health care providers, including HOWARD CENTER, extraordinary economic damages, substantial loss of resources, and capital costs. This epidemic is the largest health care crisis in U.S. history, and it has financially harmed HOWARD CENTER to the point that it has hampered its ability to provide health and addiction services.

2. Prescription opioids are deadlier than heroin. According to the National Institutes of Health, prescription opioids kill almost twice as many people in the United States as heroin. Prescription opioids and related drug overdose deaths surpass car accident deaths in the U.S. The costs to health care are overwhelming.

3. This epidemic and its consequences could have been, and should have been, prevented by the Defendants who control the U.S. drug distribution industry and the Defendants who manufacture the prescription opioids. These Defendants have profited greatly by allowing the geographic areas that HOWARD CENTER serves to become flooded with prescription opioids.

4. The drug distribution industry is supposed to serve as a "check" in the drug delivery system, by securing and monitoring opioids at every step of the stream of commerce, protecting them from theft and misuse, and refusing to fulfill suspicious or unusual orders by downstream pharmacies, doctors, clinics, or patients. Defendants woefully failed in this duty, instead consciously ignoring known or knowable problems and data in their supply chains.

5. Defendants thus intentionally and negligently created conditions in which vast amounts of opioids have flowed freely from drug manufacturers to innocent patients who became addicted, to opioid abusers, and even to illicit drug dealers - with distributors regularly fulfilling suspicious orders from pharmacies and clinics, who were economically incentivized to ignore "red flags" at the point of sale and before dispensing the pills.

6. Defendants' wrongful conduct has allowed millions of opioid pills to be diverted from legitimate channels of distribution into the illicit black market in quantities that have fueled the opioid epidemic in the patient demographic area of HOWARD CENTER. This is characterized as "opioid diversion." Acting against their common law and statutory duties, Defendants have created an environment in which opioid diversion is rampant. As a result, unknowing patients and unauthorized opioid users have ready access to illicit sources of diverted opioids.

7. For years, Defendants and their agents have had the ability to substantially reduce the death toll and adverse economic consequences of opioid diversion, including the deaths and health ruination of hundreds of thousands of citizens. Substantial expenditures by HOWARD CENTER in dealing with the problem have gone un-recouped and unreimbursed. All the Defendants in this action share responsibility for perpetuating the epidemic.

8. Defendants have foreseeably caused damages to HOWARD CENTER including the unreimbursed and/or un-recouped costs of providing: (a) opioid addiction treatment; (b) counseling and rehabilitation services; (b) lost opportunity costs; (c) the diversion of assets from the provision of other needed health treatments; and (d) increased human resources costs.

9. HOWARD CENTER brings this Complaint for injunctive relief, compensatory damages, statutory damages, and any other relief allowed by law against the Defendant opioid

drug distributors, retailers, and manufacturers that, by their actions and omissions, knowingly or negligently have distributed and dispensed prescription opioid drugs in a manner that foreseeably injured, and continues to injure HOWARD CENTER.

**PARTIES**

10. The Plaintiff HOWARD CENTER is a Vermont not-for-profit corporation with its principal place of business in Burlington, Vermont. HOWARD CENTER provides comprehensive substance abuse and addiction treatment, detoxification services, prisoner reentry programs, and mental health programs for children and adults. HOWARD CENTER provides these services to individuals and families of all ages. The opioid epidemic has flooded HOWARD CENTER with patients who require HOWARD CENTER's services. These services oftentimes go unpaid and has consequently resulted in a massive accumulation of unreimbursed costs.

11. McKesson Corporation ("McKesson") has its principal place of business in San Francisco, California and is incorporated under the laws of Delaware. During all relevant times, McKesson has distributed substantial amounts of prescription opioids to providers and retailers in the geographic areas served by HOWARD CENTER.

12. Cardinal Health, Inc. ("Cardinal") has its principal place of business in Ohio and is incorporated under the laws of Ohio. During all relevant times, Cardinal has distributed substantial amounts of prescription opioids to providers and retailers in the geographic areas served by HOWARD CENTER.

13. AmerisourceBergen Corporation ("AmerisourceBergen") has its principal place of business in Pennsylvania and is incorporated under the laws of Delaware. During all relevant times, AmerisourceBergen Corporation has distributed substantial amounts of prescription opioids to providers and retailers in the geographic areas served by HOWARD CENTER.

14. AmerisourceBergen Drug Corporation (“Amerisource Bergen Drug”) has its principal place of business in Pennsylvania and is incorporated under the laws of Delaware. During all relevant times, AmerisourceBergen Drug Corporation has distributed substantial amounts of prescription opioids to providers and retailers in the geographic areas served by HOWARD CENTER.

15. McKesson, Cardinal, AmerisourceBergen, AmerisourceBergen Drug, and Mallinckrodt (named hereinbelow) are collectively referred to hereinafter as “Distributor Defendants.”

16. CVS Health Corporation is a Delaware corporation with its principal place of business in Rhode Island. During all relevant times, CVS Health has sold and continues to sell prescription opioids in close proximity to HOWARD CENTER.

17. Walgreens Boots Alliance, Inc., a/k/a Walgreen Co. ("Walgreens”) is a Delaware corporation with its principal place of business in Illinois. At all relevant times, Walgreens’ predecessor-in-interest Rite Aid Corporation sold in the past prescription opioids in close proximity to HOWARD CENTER.

18. Walmart, Inc., which was formerly known as Wal-Mart Stores, Inc. ("Walmart"), is a publicly-traded Delaware corporation with its principal place of business in Arkansas. At all relevant times, Walmart has sold and continues to sell prescription opioids at locations in close proximity to HOWARD CENTER.

19. CVS Health, Walgreens, and Walmart are collectively referred to hereinafter as the “Pharmacy Defendants.”

20. Cephalon, Inc. (“Cephalon”) is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Cephalon manufactures, promotes, sells, and distributes opioids

such as Actiq and Fentora in the U.S. and Vermont. Actiq and Fentora have been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain." Cephalon has pled guilty to allegations for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million.

21. Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. Teva Pharmaceuticals USA, Inc. ("Teva USA") is a wholly-owned subsidiary of Teva Ltd. and is a Delaware corporation with its principal place of business in Pennsylvania. Teva USA acquired Cephalon in October 2011.

22. Teva Ltd., Teva USA, and Cephalon collaborate to market and sell Cephalon products in the U.S. Teva Ltd. conducts all sales and marketing activities for Cephalon in the U.S. through Teva USA. Teva Ltd. and Teva USA publicize Actiq and Fentora as Teva products. Teva USA sells all former Cephalon branded products through its "specialty medicines" division. The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids marketed and sold in Vermont, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events. Teva Ltd. has directed Cephalon to disclose that it is a wholly-owned subsidiary of Teva Ltd. on prescription savings cards distributed in Vermont, indicating Teva Ltd. would be responsible for covering certain co-pay costs. All of Cephalon's promotional websites, including those for Actiq and Fentora, prominently display Teva Ltd.'s logo. Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own. Through interrelated operations like these, Teva Ltd. operates in Vermont and the rest of the U.S. through its subsidiaries Cephalon and Teva USA. The U.S. is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence

of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. (Teva Ltd., Teva USA, and Cephalon, Inc. are hereinafter collectively referred to as "Cephalon").

23. Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly-owned subsidiary of Johnson & Johnson (J&J), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. Ortho-McNeil-Janssen Pharmaceuticals, Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. Janssen Pharmaceutica Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J hereinafter are collectively referred to as "Janssen"). Janssen manufactures, promotes, sells, and distributes drugs in the U.S. and Vermont, including the opioid Duragesic. Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

24. Endo Health Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals Inc. is a wholly-owned subsidiary of

Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. hereinafter are collectively referred to as "Endo.") Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the U.S. and Vermont. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the U.S. and Vermont, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

25. Allergan plc (f/k/a Actavis, plc. f/k/a Watson Pharmaceuticals, Inc.) is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. Allergan Finance, LLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.) is a Nevada limited liability company with its principal place of business in Parsippany, New Jersey. Allergan Finance, LLC is a wholly-owned subsidiary of Allergan plc, which markets and sells Allergan plc's drugs in the United States. Allergan plc and Allergan Finance, LLC are collectively referred to herein as "Allergan." Allergan manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and has also manufactured, promoted, sold, the branded drugs generic versions of Duragesic and Opana.

26. Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Parsippany, New Jersey.

27. Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) is a Delaware corporation with its principal place of business in New Jersey. Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Actavis LLC's sole member is

Actavis US Holding LLC, a limited liability company organized under the laws of Delaware and Actavis US Holding LLC's sole member is Watson Laboratories, Inc. These defendants were owned by Allergan plc until August of 2016, at which point they were sold to Teva. Until then, Allergan plc used Actavis Pharma, Inc. and Actavis LLC to market and sell its drugs in the United States. Upon information and belief, Allergan plc has therefore exercised control over and derived financial benefit from the marketing, sales, and profits of Allergan/Actavis products. (Allergan plc, Actavis plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. hereinafter are referred to collectively as "Actavis.").

28. Mallinckrodt plc is a public limited company, headquartered in the United Kingdom, which does business as Mallinckrodt Pharmaceuticals with its principal place of business in the United States in Hazelwood, Missouri, is one of the largest manufacturers of the generic opioid oxycodone. Mallinckrodt, LLC is a Delaware limited liability company, also doing business as Mallinckrodt Pharmaceuticals, with its principal place of business in the United States in Hazelwood, Missouri. Mallinckrodt plc and Mallinckrodt LLC are collectively referred to herein as "Mallinckrodt." Mallinckrodt is one of the largest manufacturers of the generic opioid oxycodone.

29. Cephalon, Janssen, Endo, Actavis, and Mallinckrodt are collectively referred to hereinafter as the "Manufacturer Defendants."[1]

**JURISDICTION AND VENUE**

30. Venue in this Court is proper under 12 V.S.A. § 402 because Plaintiff's primary

[1] HOWARD CENTER is prohibited by a Chapter 11 stay of proceedings as against Purdue Pharma L.P. and related entities, including Purdue Pharma, Inc., The Purdue Frederick Company, and others.

place of business is in Chittenden County.

31. This civil action is being brought entirely pursuant to Vermont statutory, regulatory, and common law. Plaintiff is relying upon no federal law, no federal statute, and no federal regulations with regard to any of the allegations in this Complaint. Plaintiff is not seeking any modifications of any warnings as to any of the Defendants' products, and is not seeking any equitable relief regarding labeling or on-product warnings or in product literature.[2]

32. Defendants have engaged in conduct and activities over a long time, systematically, individually, jointly, and severally, in the geographic area served by HOWARD CENTER that has caused all of HOWARD CENTER's damages and all of which form the bases of the causes of action in this Complaint as against Defendants. Defendants have committed multiple torts and breaches within the geographic areas which HOWARD CENTER serves, repeatedly and systematically.

33. Defendants, for a long time, repeatedly and systematically, have substantial contacts and business relationships with HOWARD CENTER and its patients, including consensual relationships and contracts performed within the geographic area served by HOWARD CENTER, some or all of which form the basses of the causes of action in this Complaint as against Defendants.

34. This Court has personal jurisdiction over Defendants, each of which has committed torts, in part or whole, within the State of Vermont and the geographic area served by HOWARD CENTER. Moreover, Defendants have substantial contacts and business dealings directly with

[2] Plaintiff asserts that federal courts lack subject matter over Plaintiff's claims, therefore this Complaint was improperly removed to federal court. Once removed to federal court, Plaintiff was not given the opportunity to file a motion to remand pursuant to 28 U.S.C. §1447. Specifically, the statute allows the party opposing removal 30 days to file a motion to remand. In the case at hand, the case was transferred to MDL 2804 within 18 days of being removed to federal court. Because proper procedure was not followed, Plaintiff's complaint reflects the style of the Vermont Superior Court since this is the only court that Plaintiff contends has jurisdiction over its claims.

HOWARD CENTER by virtue of their distribution, dispensing, and sales of prescription opioids. All causes of action herein relate to Defendants' wrongful actions, conduct, and omissions committed against HOWARD CENTER, and the consequences and damages related to said wrongful actions, conduct, and omissions.

## BACKGROUND FACTS

35. Opioid means "opium-like," and the term includes all drugs derived in whole or in part from the opium poppy.

36. The United States Food and Drug Administration's website describes this class of drugs as follows: "Prescription opioids are powerful pain-reducing medications that include prescription oxycodone, hydrocodone, and morphine, among others, and have both benefits as well as potentially serious risks. These medications can help manage pain when prescribed for the right condition and when used properly. But when misused or abused, they can cause serious harm, including addiction, overdose, and death."

37. Prescription opioids with the highest potential for addiction are categorized under Schedule II of the Controlled Substances Act. They include non-synthetic derivatives of the opium poppy (such as codeine and morphine, which are also called "opiates"), partially synthetic derivatives (such as hydrocodone and oxycodone), or fully synthetic derivatives (such as fentanyl and methadone).

38. Before the epidemic of Defendants' prescription opioids, the generally accepted standard of medical practice was that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the

serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

## MANUFACTURER DEFENDANTS' WRONGFUL CONDUCT

39. To establish and exploit the lucrative market of chronic pain patients, each Pharmaceutical Defendant developed a well-funded, sophisticated, and deceptive marketing and/or distribution scheme targeted at consumers and physicians. These Defendants used direct marketing, as well as veiled advertising by seemingly independent third parties to spread false and deceptive statements about the risks and benefits of long-term opioid use – statements that created the "new" market for prescription opioids, upended the standard medical practice, and benefited other Defendants and opioid manufacturers. These statements were unsupported by and contrary to the scientific evidence. They also targeted susceptible prescribers and vulnerable patient populations, including those in the geographic areas served by HOWARD CENTER.

40. The Manufacturer Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients in Vermont. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout HOWARD CENTER's geographic areas and patient demographics.

41. The Manufacturer Defendants' direct and branded ads deceptively portrayed the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs, misleadingly implying that the drug would provide long-term pain relief and functional improvement.

42. The Manufacturer Defendants also promoted the use of opioids for chronic pain

through "detailers" – sophisticated and specially trained sales representatives who visited individual doctors and medical staff, and fomented small-group speaker programs. In 2014, for instance, these Defendants spent almost $200 million on detailing branded opioids to doctors.

43. The Manufacturer Defendants invited doctors to participate, for payment and other remuneration, on and in speakers' bureaus and programs paid for by these Defendants. These speaker programs were designed to provide incentives for doctors to prescribe opioids, including recognition and compensation for being selected as speakers. These speakers give the false impression that they are providing unbiased and medically accurate presentations when they are, in fact, presenting a script prepared by these Defendants. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

44. The Manufacturer Defendants' detailing to doctors was highly effective in the national proliferation of prescription opioids. Defendants used sophisticated data mining and intelligence to track and understand the rates of initial prescribing and renewal by individual doctors, allowing specific and individual targeting, customizing, and monitoring of their marketing.

45. The Manufacturer Defendants have had unified marketing plans and strategies from state to state, including Vermont. This unified approach ensures that Defendants' messages were and are consistent and effective across all their marketing efforts.

46. The Manufacturer Defendants deceptively marketed opioids in Vermont through unbranded advertising that promoted opioid use generally, yet silent as to a specific opioid. This advertising was ostensibly created and disseminated by independent third parties, but funded, directed, coordinated, edited, and distributed, in part or whole, by these Defendants and their public

relations firms and agents.

47. The Manufacturer Defendants used putative third-party, unbranded advertising to avoid regulatory scrutiny as such advertising is not submitted to or reviewed by the FDA. These Defendants used third-party, unbranded advertising to create the false appearance that the deceptive messages came from an independent and objective source.

48. The Manufacturer Defendants' deceptive unbranded marketing also contradicted their branded materials reviewed by the FDA.

49. The Manufacturer Defendants marketed opioids through a small circle of doctors who were vetted, selected, funded, and promoted by these Defendants because their public positions supported the use of prescription opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs." These Defendants paid KOLs to serve in a number of doctor-facing and public-facing capacities, all designed to promote a pro-opioid message and to promote the opioid industry pipeline, from manufacture to distribution to retail.

50. These Defendants entered into and/or benefitted from relationships with seemingly unbiased and independent organizations or groups that generated treatment guidelines, unbranded materials, and programs promoting chronic opioid therapy, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF"), and Pain & Policy Studies Group ("PPSG").

51. The Manufacturer Defendants collaborated, through the aforementioned organizations and groups, to spread deceptive messages about the risks and benefits of long-term opioid therapy.

52. To convince doctors and patients in Vermont that opioids can and should be used

to treat chronic pain, these Defendants had to persuade them that long-term opioid use is both safe and helpful. Knowing that they could do so only by deceiving those doctors and patients about the risks and benefits of long-term opioid use, these Defendants made claims that were not supported by or were contrary to the scientific evidence and which were contradicted by data.

53. To convince doctors and patients that opioids are safe, the Manufacturer Defendants deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that: (a) starting patients on opioids was low- risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (b) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (c) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (d) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. Defendants have not only failed to correct these misrepresentations, but they also continue to make them today.

54. The Manufacturer Defendants falsely claimed that the risk of opioid addiction is low, and that addiction is unlikely to develop when opioids are prescribed, as opposed to obtained illicitly, and failed to disclose the greater risk of addiction with prolonged use of opioids. Some examples of these false and deceptive claims by opioid manufacturers are: (a) Actavis employed a patient education brochure that falsely claimed opioid addiction is "less likely if you have never had an addiction problem;" (b) Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain*, falsely claiming that addiction is rare and limited to extreme cases of

unauthorized doses; (c) Endo sponsored a website, Painknowledge.com, which falsely claimed that "[p]eople who take opioids as prescribed usually do not become addicted"; (d) Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated that: "most people do not develop an addiction problem;" (e) Janssen distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults* which described as "myth" the claim that opioids are addictive; and (f) a Janssen website falsely claimed that concerns about opioid addiction are "overestimated."

55. These claims are contrary to fact and the Defendants' own data and documents, as well as experts in this area.

56. The falsity of the Manufacturer Defendants' claims about the low risk of addiction has been rejected by almost every objective health professional in the United States and Vermont. In fact, opioid prescription drugs have a high potential for abuse, associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death. These known serious risks, associated with long-term opioid use, including risks of addiction, abuse, and misuse, even at recommended doses, and the greater risks of overdose and death," make prescription opioids inappropriate for most persons.

57. The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder." Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State of New York found no evidence for that statement. Consistent with this, Endo agreed not to "make statements

that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. This agreement, however, did not extend to Vermont.

58. The Manufacturer Defendants falsely instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. Defendants called this phenomenon "pseudo-addiction" – a term used by Dr. David Haddox and Dr. Russell Portenoy, a KOL for Cephalon, Endo, and Janssen. Defendants falsely claimed that pseudo-addiction was substantiated by scientific evidence. Some examples of these deceptive claims are: (a) Cephalon sponsored *Responsible Opioid Prescribing*, which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudo-addiction, rather than true addiction; (b) Janssen sponsored, funded, and edited the *Let's Talk Pain* website, which in 2009 stated: "pseudo-addiction . . . refers to patient behaviors that may occur when pain is under-treated;" (c) Endo sponsored a National Initiative on Pain Control (NIPC) CME program titled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which promoted pseudo-addiction by teaching that a patient's aberrant behavior was the result of untreated pain.

59. The Manufacturer Defendants falsely instructed doctors and patients that addiction risk screening tools, patient agreements, urine drug screens, and similar strategies were very effective to identify and safely prescribe opioids to even those patients predisposed to addiction. These misrepresentations were reckless because Manufacturer Defendants directed them to general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. Manufacturer Defendants' misrepresentations were intended to make doctors more comfortable in prescribing opioids. An example of these deceptive claims is an Endo supplement in the *Journal of Family Practice* that emphasized the effectiveness of screening tools

to avoid addictions.

60. Facts discovered in the prescription opiates litigation, as well in other civil actions, magnify the falsity of these misrepresentations, as there are no studies assessing the effectiveness of risk mitigation strategies – such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse – for improving outcomes related to overdose, addiction, abuse, or misuse.

61. To underplay the risk and impact of addiction, and make doctors feel more comfortable starting patients on opioids, Manufacturer Defendants falsely claimed that opioid dependence can easily be solved by tapering, that opioid withdrawal was not difficult, and that there were no problems in stopping opioids after long-term use.

62. A CME sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms could be avoided by tapering a patient's opioid dose by up to 20% for a few days.

63. Manufacturer Defendants deceptively minimized the significant symptoms of opioid withdrawal, including drug cravings, anxiety, insomnia, abdominal pain, vomiting, sweating, tremor, tachycardia, spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction – and grossly understated the difficulty of tapering, particularly after long-term opioid use.

64. The Manufacturer Defendants falsely claimed that doctors and patients could increase opioid dosages indefinitely without the added risk of addiction and other health consequences and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment

when patients built up a tolerance, and lower dosages did not provide pain relief. For example: (a) an Actavis patient brochure stated - "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction;" (b) Cephalon sponsored *APF's Treatment Options: A Guide for People Living with Pain*, claiming that some patients need larger doses of opioids, with "no ceiling dose" for appropriate treatment of severe, chronic pain; (c) an Endo website, painknowledge.com, claimed that opioid dosages may be increased until "you are on the right dose of medication for your pain;" (d) an Endo pamphlet *Understanding Your Pain: Taking Oral Opioid Analgesics*, stated "The dose can be increased. . . . You won't 'run out' of pain relief;" (e) a Janssen patient education guide *Finding Relief: Pain Management for Older Adults* listed dosage limitations as "disadvantages" of other pain medicines yet omitted any discussion of risks of increased opioid dosages.

65. These and other representations conflict with the objective scientific evidence. There are no benefits of high-dose opioids for chronic pain. The risks for serious harms related to opioid therapy increase at higher opioid dosage. Overdose risk is increased at higher opioid dosages. There is an increased risk for opioid use disorder, respiratory depression, and death at higher dosages. Studies suggest an association between high-dose opioid use and the risk of overdose and/or overdose mortality.

66. Manufacturer Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids created false impressions that these opioids can curb addiction and abuse. Indeed, in a 2014 survey of 1,000 primary care physicians, nearly half reported that they believed abuse-deterrent formulations are inherently less addictive.

67. Manufacturer Defendants have made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter abuse. For example, Endo's advertisements

for the 2012 reformulation of Opana ER falsely claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. The FDA warned in a 2013 letter that there was no evidence Endo's design "would provide a reduction in oral, intranasal or intravenous abuse." Moreover, Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed.

68. In a 2016 settlement with the State of New York, Endo agreed not to make statements in New York that Opana ER was "designed to be, or is crush resistant." The State found those statements false and deceptive because there was no difference in the ability to extract the narcotic from Opana ER. No studies support the notion that abuse-deterrent technologies are a risk mitigation strategy for deterring or preventing abuse. Opioid abuse is not avoidable through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes.

69. These numerous, longstanding misrepresentations minimizing the risks of long-term opioid use persuaded doctors and patients to discount or ignore the true risks. Manufacturer Defendants also had to persuade them that there was a significant upside to long-term opioid use. There is insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain. Despite this, Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence. Not only have Defendants failed to correct these false and deceptive claims, they continue to make them today.

70. For example, the Manufacturer Defendants falsely claimed that long-term opioid use improved patients' function and quality of life, including the following misrepresentations: (a) an Actavis advertisement claimed that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy

their lives; (b) an Endo advertisement that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks, portraying seemingly healthy, unimpaired persons; (c) a Janssen patient education guide *Finding Relief: Pain Management for Older Adults* stated as "a fact" that "opioids may make it easier for people to live normally" such as sleeping peacefully, working, recreation, sex, walking, and climbing stairs; (d) *Responsible Opioid Prescribing,* by Cephalon and Endo, taught that relief of pain by opioids, by itself, improved patients' function; (e) Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* counseling patients that opioids "give [pain patients] a quality of life we deserve;" (f) Endo's NIPC website *painknowledge.com* claimed that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse;" (g) Endo CMEs titled *Persistent Pain in the Older Patient* claimed that chronic opioid therapy had been "shown to reduce pain and improve depressive symptoms and cognitive functioning;" (h) Janssen sponsored, funded, and edited a website, *Let's Talk Pain*, in 2009, which featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function;" (i) Cephalon's, Endo's, and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

71. These claims find no support in the scientific literature. There is no evidence that opioids improve pain or function with long-term use. No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain. While opioids can reduce pain during short-term use, there is insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy. There is a lack of evidence of improved pain tolerance or function with long-term use of opioids for several chronic

pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia.

72. As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

73. The Manufacturer Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by Defendants contravene scientific evidence. NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

74. In addition, opiate pills were misleadingly promoted as being unique among opioids in providing 12 continuous hours of pain relief with one dose. According to research, the effects of opiate pills wear off in under six hours in one-quarter of patients and in under 10 hours in more than half. This phenomenon is known as "end of dose" failure, and chronic pain patients experience it. This not only renders 12-hour acting promises of relief as false and deceptive, it also makes opiate pills even more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more pills before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence. Endo ran false and misleading advertisements for Opana ER, referring to "real" 12-hour dosing. Cephalon deceptively marketed its opioids Actiq and Fentora for chronic pain even though their use should have been limited to the treatment of cancer pain in opioid-tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for or has been shown to be safe or effective for chronic pain. Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post-

operative pain, or pain due to injury.

75. Despite this, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe. As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain. For example: (a) Cephalon paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of *Pain Medicine News* in 2009. The CME instructed doctors that "clinically, broad classification of pain syndromes as either cancer- or noncancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain; (b) Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain; and (c) in December 2011, Cephalon widely disseminated a journal supplement entitled "*Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)*" to *Anesthesiology News*, *Clinical Oncology News*, and *Pain Medicine News* – three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer pain.

76. Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were safe and effective for treating chronic pain.

77. Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the State of New York found that Endo failed to require sales representatives to report signs of abuse, diversion, and

inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

78. Mallinckrodt, one of the largest manufacturers of the generic opioid oxycodone, paid penalties to resolve allegations that it failed to report suspicious drug orders. Mallinckrodt supplied distributors increasingly excessive amounts of oxycodone pills without notifying Vermont or health professionals of the suspicious orders. Those distributors, in turn, supplied the drugs to various U.S. pharmacies and pain clinics. Mallinckrodt, however, continues to deny culpability to the public and the medical community. Michael-Bryant Hicks, Mallinckrodt's general counsel, said the company chose to settle "to eliminate the uncertainty, distraction and expense of litigation and to allow the company to focus on meeting the important needs of its patients and customers."

79. As a part of their deceptive marketing scheme, the Manufacturer Defendants identified and targeted susceptible prescribers and vulnerable patient populations in Vermont and the geographic areas served by HOWARD CENTER. For example, these Defendants focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs, but were less likely to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept Defendants' misrepresentations.

80. The Manufacturer Defendants also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain. These Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. Existing evidence shows that elderly patients taking opioids suffer from elevated fall and

fracture risks, greater risk of hospitalization, and increased vulnerability to adverse drug effects and interactions. There are unacceptable risks of long-term opioid use for elderly patients. The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post-traumatic stress disorder, which interact dangerously with opioids.

81. The Manufacturer Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and deceptive. The history of opioids, especially known by the Defendants at all relevant times, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. Defendants had access to scientific studies, detailed prescription data, internal data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers.

82. Moreover, at all times relevant to this Complaint, the Manufacturer Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct. For example, the Manufacturer Defendants disguised their own role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. These Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of Defendants' false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain.

83. The Manufacturer Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. These

Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, fake independent groups, and public relations companies that were not and have not yet become public. For example, painknowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other Manufacturer Defendants, such as Janssen, ran similar websites that masked their own direct role.

84. Finally, the Manufacturer Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. These Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for these Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions.

85. Thus, the Manufacturer Defendants successfully concealed from the medical community, patients, and health care providers facts sufficient to arouse suspicion of the claims that HOWARD CENTER now asserts. HOWARD CENTER did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

86. The Manufacturer Defendants' misrepresentations deceived doctors and patients about the risks and benefits of long-term opioid use. Studies also reveal that many doctors and patients are not aware of or do not understand these risks and benefits. Indeed, patients often report that they were not warned they might become addicted to opioids prescribed to them. As reported in January 2016, a 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told opioids were potentially addictive.

87. The Manufacturer Defendants' deceptive marketing scheme caused doctors in

Vermont, and specifically in the geographic areas served by HOWARD CENTER, to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia. Absent these Defendants' deceptive marketing scheme, these doctors would not have prescribed as many opioids. These Defendants' deceptive marketing schemes also caused patients to purchase and use opioids for their chronic pain, believing they are safe and effective. Absent these Defendants' deceptive marketing scheme, fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them.

88. The Manufacturer Defendants' deceptive marketing has caused and continues to cause the prescribing and use of opioids to explode. Indeed, this dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in Defendants' spending on their deceptive marketing scheme. Defendants' spending on opioid marketing totaled approximately $91 million in 2000. By 2011, that spending had tripled to $288 million.

89. The escalating number of opioid prescriptions written by doctors who were deceived by the Manufacturer Defendants' deceptive marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the U.S., Vermont, and in the geographic areas served by HOWARD CENTER.

90. Scientific evidence demonstrates a strong correlation between opioid prescriptions and opioid abuse. Patients receiving prescription opioids for chronic pain account for the majority of overdoses.

91. Contrary to the Manufacturer Defendants' misrepresentations, most opioid addiction begins with legitimately *prescribed* opioids, and therefore could have been prevented had Defendants' representations to prescribers been truthful. In 2011, 71% of people who abused prescription opioids got them through friends or relatives, not from pill mills, drug dealers or the

internet. Numerous doctors and substance abuse counselors note that many of their patients, who misuse or abuse opioids started with legitimate prescriptions, confirming the important role that doctors' prescribing habits have played in the opioid epidemic.

## DISTRIBUTOR DEFENDANTS' WRONGFUL CONDUCT

92. The supply chain for prescription opioids begins with the manufacture and packaging of the pills. The manufacturers then transfer the pills to distribution companies, including Defendants Cardinal, McKesson, AmerisourceBergen, and Amerisource Bergen Drug, which together account for much of the revenues from drug distribution in the United States. The distributors then supply opioids to pharmacies, doctors, and other healthcare providers, which then dispense the drugs to patients.

93. Manufacturer Defendants and Distributor Defendants share the responsibility for controlling the availability of prescription opioids. Opioid "diversion" occurs whenever the supply chain of prescription opioids is broken, and the drugs are transferred from a legitimate channel of distribution or use, to an illegitimate channel of distribution or use. Diversion can occur at any point in the opioid supply chain, including at the pharmacy level, when prescriptions are filled for any reason other than a legitimate medical purpose.

94. For example, at the wholesale level of distribution, diversion occurs whenever distributors allow opioids to be lost or stolen in transit, or when distributors fill suspicious orders of opioids from buyers, retailers, or prescribers. Suspicious orders include orders of unusually large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern, and/or orders of unusual frequency and duration.

95. Diversion occurs at the pharmacies, including whenever a pharmacist fills a prescription despite having reason to believe it was not issued for a legitimate medical purpose or

not in the usual course of practice. Some of the signs that a prescription may have been issued for an illegitimate medical purpose include when the patient seeks to fill multiple prescriptions from different doctors (a/k/a doctor shopping), when they travel great distances between the doctor or their residence and the pharmacy to get the prescription filled, when they present multiple prescriptions for the largest dose of more than one controlled substance, or when there are other "red flags" surrounding the transaction. These signs or "red flags" should trigger closer scrutiny of the prescriptions by the pharmacy and lead to a decision that the patient is not seeking the medication for purposes to treat a legitimate medical condition. In addition to diversion via prescription, opioids are also diverted from retail outlets when stolen by employees or others.

96. Diversion occurs through the use of stolen or forged prescriptions at pharmacies, or the sale of opioids without prescriptions, including patients seeking prescription opioids under false pretenses.

97. Opioid diversion occurs in the United States and Vermont at an alarming rate. In many years, the number of people who take prescription opioids for non-medical purposes is greater than the number of people who use cocaine, heroin, hallucinogens, and inhalants combined.

98. Every year, millions of people in the United States misuse and abuse opioid pain relievers that can lead to addiction, overdose and death.

99. Within the last 20 years, the abuse of prescription narcotic pain relievers has emerged as a public health crisis in the United States. Overdose deaths involving prescription opioids are at epidemic proportions, quadrupling since 1999, concomitant with sales of these prescriptions.

100. In 2011 overdose deaths from prescription opioids reached 16,917 people. In 2014 18,893 people died from a prescription opioid-related overdose. In 2015, the number of deaths

increased to 22,598, even despite increased public health announcements.

101. The dramatic rise in heroin use in recent years is a direct result of prescription opioid diversion. The strongest risk factor for a heroin use disorder is prescription opioid use. In one national study covering the period 2008 to 2010, 77.4% of the participants reported using prescription opioids before initiating heroin use. Approximately 75% of those who began their opioid abuse in the 2000s started with a prescription opioid. People who are dependent on prescription opioid painkillers are 40 times more likely to become dependent on heroin. Heroin deaths are on a tragic upswing: In 2015, over 12,989 people died from heroin overdose-up more than 20% from approximately 10,574 overdose deaths in 2014.

102. HOWARD CENTER has taken proactive measures in its own community to fight against prescription opioid abuse.

103. Defendants' opioid diversion diminishes HOWARD CENTER’s ability to combat other addiction issues and co-morbid mental health conditions, decreases productivity, increases poverty, and consequently requires greater expenditures by HOWARD CENTER in treating opioid-addicted patients.

104. Distributor Defendants have a duty to exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

105. In addition to having common law duties, the Distributor Defendants are governed by Vermont law regulations. These requirements were enacted to protect society from the harms of drug diversion. The Distributor Defendants' violations of these requirements show that they

failed to meet the relevant standard of conduct that society expects from them. The Distributor Defendants' repeated, unabashed, and prolific violations of these requirements show that they have acted in total reckless disregard.

106. Vermont law provides for a system of checks and balances from the manufacturing level through the delivery of the pharmaceutical drug to the patient or ultimate user. Every person or entity that manufactures, distributes, or dispenses opioids in Vermont is subject to Vermont law and regulations.

107. All opioid distributors are required to maintain effective controls against opioid diversion. They are also required to create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders include orders of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency. To comply with these requirements, distributors must know their customers, report susp1c1ous orders, conduct due diligence, and terminate orders if there are indications of diversion.

108. Vermont law has a distribution monitoring system for controlled substances to prevent unauthorized users from obtaining opioids.

109. For years the Distributor Defendants have known of the problems and consequences of opioid diversion in the supply chain.

110. The Distributor Defendants' own industry group, the Healthcare Distribution Management Association, published Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," emphasizing the critical role of each member of the supply chain in distributing controlled substances.

111. These industry guidelines stated: "At the center of a sophisticated supply chain,

distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

112. Opioid distributors have admitted to the magnitude of the problem and, at least superficially, their legal responsibilities to prevent diversion. They have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

113. For example, a Cardinal executive claimed that Cardinal uses “advanced analytics" to monitor its supply chain. He further extolled that Cardinal was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any *outside* criminal activity." (emphasis added).

114. McKesson has publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claimed it is "deeply passionate about curbing the opioid epidemic in our Country."

115. In addition to the obligations imposed by law, through their own words, representations, and actions, the Distributor Defendants have voluntarily undertaken a duty to protect the public at large against diversion from their supply chains, and to curb the opioid epidemic. In this voluntary undertaking, the Distributor Defendants have miserably and negligently failed.

116. The Distributors Defendants have knowingly or negligently allowed diversion. Their wrongful conduct and inaction have resulted in numerous civil fines and other penalties. Cardinal has paid millions of dollars regarding allegations about opioid diversion taking place at its warehouses in the United States in multiple states. AmerisourceBergen once lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies.

117. Relying upon state laws and regulations, various State Boards of Pharmacy have directly disciplined the wholesale distributors of prescription opioids for failure to prevent diversion, a duty recognized under state laws and regulations.

118. Although distributors have been penalized by law enforcement authorities, these penalties have not changed their conduct. They pay fines as a cost of doing business in an industry that generates billions of dollars in revenue and profit.

119. The Distributor Defendants have the ability and owe the duty to prevent opioid diversion, which presented a known or foreseeable risk of damage to HOWARD CENTER.

120. The Distributor Defendants have supplied massive quantities of prescription opioids in and around the geographic areas served by HOWARD CENTER with the actual or constructive knowledge that the opioids were ultimately being consumed by citizens for non-medical purposes. Many of these shipments should have been stopped or investigated as suspicious orders, but the Distributor Defendants negligently or intentionally failed to do so.

121. Each Distributor Defendant knew or should have known that the amount of the opioids that it allowed to flow into the geographic areas served by HOWARD CENTER was far in excess of what could be consumed for medically-necessary purposes in the relevant communities (especially given that each Distributor Defendant knew it was not the only opioid distributor servicing those communities).

122. The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably-prudent distributor of opioids would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists and doctors who were

purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in and around the geographic areas served by HOWARD CENTER; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies and using a little bit of common sense.

123. On information and belief, the Distributor Defendants made little to no effort to visit the pharmacies servicing patients of HOWARD CENTER, and in the geographic areas it serves, to perform due diligence inspections to ensure that the opioids the Distributors Defendants had furnished were not being diverted to illegal uses.

124. On information and belief, the compensation the Distributor Defendants provided to a certain number of their employees was affected, in part, by the volume of their sales of opioids to pharmacies and other facilities servicing the patients of HOWARD CENTER and in the geographic areas it serves, thus improperly creating incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse.

125. It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the geographic areas served by HOWARD CENTER with highly-addictive opioids would allow opioids to fall into the hands of children, addicts, criminals, and other unintended users.

126. It is reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including addiction, overdoses, and death. It is also reasonably foreseeable that the costs of these injuries will be shouldered by HOWARD CENTER.

127. The Distributor Defendants knew or should have known that the opioids being

diverted from their supply chains would contribute to the opioid costs of HOWARD CENTER, and would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

128. The Distributor Defendants knew or should have known that a substantial amount of the opioids dispensed to patients of HOWARD CENTER were being dispensed based on invalid or suspicious prescriptions. It is foreseeable that filling suspicious orders for opioids will cause harm to individual pharmacy customers, third parties, and HOWARD CENTER.

129. The Distributor Defendants were aware of widespread prescription opioid abuse of persons who would become patients of HOWARD CENTER, but they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in the geographic areas served by HOWARD CENTER—and in such quantities, and with such frequency—that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

130. If any of the Distributor Defendants adhered to effective controls to guard against diversion, HOWARD CENTER would have avoided significant damages.

131. The Distributor Defendants made substantial profits over the years based on the diversion of opioids affecting HOWARD CENTER. Their participation and cooperation in a common enterprise have foreseeably caused damages to HOWARD CENTER. The Distributor Defendants knew full well that HOWARD CENTER would be unjustly forced to bear the costs of these injuries and damages.

132. The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids to communities showed an intentional or reckless disregard for HOWARD CENTER. Their conduct poses a continuing economic threat to HOWARD CENTER.

133. The Manufacturer Defendants, including Mallinckrodt, have engaged in similar wrongful conduct as alleged hereinabove as the Distributor Defendants.

**PHARMACY DEFENDANTS' WRONGFUL CONDUCT**

134. Pharmacies must exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

135. Pharmacies are the "last line of defense" in keeping drugs from entering the illicit market. They are meant to be the drug experts in the healthcare delivery system and, as such, have considerable duties and responsibility in the oversight of patient care. They cannot blindly fill prescriptions written by a doctor if the prescription is not for a legitimate medical purpose.

136. Vermont law imposes duties and requirements on the conduct of the Pharmacy Defendants. These requirements, along with their related regulations and agency interpretations, set a standard of care for pharmacy conduct.

137. Vermont law requires pharmacists to review each controlled substance prescription and, prior to dispensing medication, make a professional determination that the prescription is effective and valid.

138. Under the Vermont law, pharmacies thus should have processes in place to guard against over-prescriptions, theft or deception by a customer or non-customer, and/or wrongful diversion of controlled substances.

139. Pharmacists are required to ensure that prescriptions for controlled substances are valid. Pharmacists are the last check in the opioid distribution industry. Pharmacists are to ensure

that prescriptions are issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice.

140. By filling prescriptions of questionable or suspicious origin or overprescriptions, the Pharmacy Defendants have violated the Vermont Deceptive Trade Practices Act.

141. The Pharmacy Defendants are the last guard against prescriptions written by physicians or physician assistants that appear to be outside the bounds of the usual course of professional treatment. Filling and distributing the opioids within such a prescription is against Vermont law.

142. Pharmacy boards, national industry associations, and continuing education programs have provided extensive guidance to pharmacists concerning their duties to the public. The guidance teaches pharmacists how to identify red flags, which indicate to the pharmacist that there may be a problem with the legitimacy of a prescription presented by a patient. The guidance also tells pharmacists how to resolve the red flags and what to do if the red flags are unresolvable.

143. The industry guidance tells pharmacists how to recognize (a) stolen prescription pads; (b) prescription pads printed using a legitimate doctor's name, but with a different call back number that is answered by an accomplice of the drug-seeker; (c) prescriptions written using fictitious patient names and addresses; (d) overprescribing doctors and physician assistants, and so on.

144. Questionable or suspicious prescriptions include: prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities) for controlled substances compared to other practitioners in the area; prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; prescriptions that look "too good" or where the

prescriber's handwriting is too legible; prescriptions with quantities or dosages that differ from usual medical usage; prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; photocopied prescriptions; or prescriptions containing different handwritings. Most of the time, these attributes are not difficult to detect or recognize; they should be apparent to an adequately trained pharmacist.

145. Signs that a customer is seeking opioids for the purpose of diversion include customers who: appear to be returning too frequently; are seeking to fill a prescription written for a different person; appear at the pharmacy counter simultaneously, or within a short time, all bearing similar prescriptions from the same physician; are not regular patrons or residents of the community, and show up with prescriptions from the same physician; drive long distances to have prescriptions filled; seek large volumes of controlled substances in the highest strength in each prescription; seek a combination of other drugs with opioids such as tranquilizers and muscle relaxers that can be used to create an "opioid cocktail"; and pay large amounts of cash for their prescriptions rather than using insurance.

146. Other "red flags" include when prescriptions that lack the technical requirements of a valid prescription; prescriptions written in excess of the amount needed for proper therapeutic purposes; prescriptions obtained through disreputable or illegal web-based pharmacies; and patients receiving multiple types of narcotic pain killers on the same day.

147. All of these issues have been outlined in pharmacist training programs throughout the United States and Vermont, and have been used as examples by individual State Boards of Pharmacy and the National Association of Boards of Pharmacy.

148. Industry standards require pharmacists to contact the prescriber for verification or clarification whenever there is a question about any aspect of a prescription order. If a pharmacist

is ever in doubt, he or she must ask for proper identification. If a pharmacist believes the prescription is forged or altered, he or she should not dispense it and call the local police. If a pharmacist believes he or she has discovered a pattern of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

149. A standard of care for the Pharmacy Defendants is also set by applicable professional regulations in Vermont. It is a violation of professional standards not to attempt to address the suspected addiction of a patient to a drug dispensed by the pharmacist if there is reason to believe the patient may be addicted. 3 V.S.A. § 801; 18 V.S.A. § 4289(e).

150. On information and belief, the Pharmacy Defendants regularly filled prescriptions in circumstances where red flags were present (and sometimes many red flags).

151. On information and belief, the Pharmacy Defendants regularly filled opioid prescriptions that would have been deemed questionable or suspicious by a reasonably prudent pharmacy.

152. On information and belief, the Pharmacy Defendants have not adequately trained or supervised their employees at the point of sale to investigate or report suspicious or invalid prescriptions or protect against corruption or theft by employees or others.

153. On information and belief, the Pharmacy Defendants utilize monetary compensation programs for certain employees that are based, in part, on the number of prescriptions filled and dispensed. This type of compensation creates economic disincentives within the companies to change their practices. For example, there have been reports of chain store supervisory personnel directing pharmacists to fill prescriptions regardless of the red flags presented.

154. The Pharmacy Defendants have violated a voluntarily undertaken duty to the

public. In news reports and other public documents, it has been reported that the Pharmacy Defendants, through their words or actions, have assured the public that issues affecting public health and safety are the highest priority for the defendants.

155. For example, in 2015, CVS publicly stated that "the abuse of controlled substance pain medication is a nationwide epidemic that is exacting a devastating toll upon individuals, families and communities. Pharmacists have a legal obligation to determine whether a controlled substance was issued for a legitimate purpose and to decline to fill prescriptions they have reason to believe were issued for a non-legitimate purpose."

156. In failing to take adequate measures to prevent substantial opioid-related injuries that have affected HOWARD CENTER, the Pharmacy Defendants have breached their duties under the "reasonable care" standard and professional duties under the relevant standards of professional practice.

157. It is foreseeable to the Pharmacy Defendants that filling invalid or suspicious prescriptions for opioids would cause harm to individual pharmacy customers, HOWARD CENTER's patients who may use the wrongfully-dispensed opioids and HOWARD CENTER's treatment services.

158. It is reasonably foreseeable to the Pharmacy Defendants that, when unintended users gain access to opioids, tragic yet preventable injuries and damages will result, including overdoses and death.

159. At all relevant times, the Pharmacy Defendants have engaged in improper dispensing practices, and continue to do so, despite knowing full well they could take measures to substantially eliminate their complicity in the opioid diversion.

160. At all relevant times, the Pharmacy Defendants engaged in these activities, and

continue to do so, knowing full well that HOWARD CENTER, in its role of providing treatment and services, would provide or pay for additional medical services, emergency services, and other necessary services, and would suffer the loss of substantial economic productivity.

161. It is reasonably foreseeable to the Pharmacy Defendants that HOWARD CENTER would be forced to bear substantial expenses as a result of the Pharmacy Defendants' acts.

162. The Pharmacy Defendants were on notice of their ongoing negligence or intentional misconduct in part because of their history of being penalized for violating their duties and legal requirements in other jurisdictions.

163. In 2013, Defendant CVS agreed to pay $11 million to avoid civil charges for violating federal laws relating to the sales of prescription opioids at pharmacies in the State of Oklahoma. Specifically, CVS allegedly violated the recordkeeping requirements for tracking and dispensing prescription drugs, including oxycodone and hydrocodone.

164. Nationally, Walgreens has settled investigations with the DEA related to controlled substances in at least two states involving millions of dollars in fines and penalties.

165. Defendants, CVS, Walgreens, and Walmart each have one or more pharmacies that fill prescriptions for opioids that are operating within or in close proximity to the geographic areas served by HOWARD CENTER.

166. Various State Boards of Pharmacy have also prosecuted and disciplined numerous pharmacists and pharmacy technicians employed by the Pharmacy Defendants for diversion of prescription opioids.

167. The Pharmacy Defendants were also aware of the magnitude of the opioid diversion crisis based on investigations into their practices elsewhere. For example, in 2013, Walgreens settled with the DEA for $80 million, resolving allegations that it committed an unprecedented

number of record-keeping and dispensing violations at various retail locations and a distribution center. As part of the settlement, Walgreens agreed to enhance its training and compliance programs, and to no longer compensate its pharmacists based on the volume of prescriptions filled.

168. Similarly, in 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies had dispensed prescription opioids, "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."

169. CVS also agreed to pay $450,000 to resolve allegations that pharmacists were filling opioid prescriptions written by unauthorized medical personnel. More recently, in 2016, CVS settled a case in Massachusetts, by agreeing to pay $3.5 million to resolve allegations that 50 CVS stores violated the federal CSA by filling forged oxycodone prescriptions more than 500 times between 2011 and 2014.

## **COUNT I: NUISANCE**

170. The Plaintiff reasserts the allegations of paragraphs 1 through 170 as if set forth fully herein.

171. The nuisance is the over-saturation of opioids in the patient population of HOWARD CENTER and in the geographic areas served by HOWARD CENTER for non-medical purposes, as well as the adverse social, economic, and human health outcomes associated with widespread illegal opioid use.

172. All Defendants substantially participated in nuisance-causing activities.

173. Defendants' nuisance-causing activities include selling or facilitating the sale of prescription opioids to the patients of HOWARD CENTER, as well as to unintended users, including children, people at risk of overdose or suicide, and criminals.

174. Defendants' nuisance-causing activities also include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of controlled substances, and their failure to adequately design and operate a system to detect, halt and report suspicious orders of controlled substances.

175. Defendants' activities unreasonably interfere with the economic rights of HOWARD CENTER.

176. The Defendants' interference with these rights of HOWARD CENTER is unreasonable because it:

a. Has harmed and will continue to harm the public health services of and public peace of HOWARD CENTER;

b. Has harmed and will continue to harm the communities and neighborhoods which HOWARD CENTER services;

c. Is proscribed by Vermont law and regulation, pharmacy regulations, the Vermont consumer protection statutes, and ordinary and reasonable care;

d. Is of a continuing nature and it has produced long-lasting effects; and

e. Defendants have reason to know their conduct has a significant and deleterious effect upon HOWARD CENTER.

177. The nuisance undermines public health, quality of life, and safety. It has resulted in increased crime and property damage. It has resulted in high rates of addiction, overdoses, dysfunction, and despair within families and entire communities.

178. The resources of treatment centers, such as HOWARD CENTER, are being unreasonably consumed in efforts to address the prescription drug abuse epidemic, thereby eliminating available resources needed in other health care areas.

179. Defendants' nuisance-causing activities are not outweighed by the utility of Defendants' behavior. In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimately recognized societal interest in failing to identify, halt, and report suspicious opioid transactions.

180. At all times, all Defendants possessed the right and ability to control the nuisance-causing an outflow of opioids from pharmacy locations or other points of sale. Manufacturer Defendants flooded the distribution channels and the geographic and demographic areas of HOWARD CENTER with opioid pills. Distributor Defendants had the power to shut off the supply of illicit opioids to patients and consumers in the geographic areas served by HOWARD CENTER, yet did the opposite by flooding the U.S. with opioid pills. The Pharmacy Defendants aided and abetted this nuisance by failing to heed their own internal data on the extent of opioid prescriptions.

181. As a direct and proximate result of the nuisance, HOWARD CENTER has sustained economic harm by spending a substantial amount of money trying to remedy and abate the harms caused by Defendants' nuisance-causing activity, including, but not limited to, costs of treatment services for which they have not been compensated.

182. HOWARD CENTER has also suffered unique harms different from individual opioid users and governmental entities at large, namely, that HOWARD CENTER has been harmed in its proprietary interests.

183. The effects of the nuisance can be abated, and the further occurrence of such harm and inconvenience can be prevented.

184. Defendants should be required to pay the expenses HOWARD CENTER has incurred or will incur in the future to fully abate the nuisance.

**COUNT II: NEGLIGENCE AND GROSS NEGLIGENCE**

185. The Plaintiff reasserts the allegations of paragraphs 1 thru 170 as if set forth fully herein.

186. Defendants owe a non-delegable duty to HOWARD CENTER to conform their behavior to the legal standard of reasonable conduct under the circumstances, in the light of the apparent risks.

187. There is no social value to Defendants' challenged behavior. In fact, Defendants' entire conduct, behavior, actions, misrepresentations, conspiracies, and omissions are against the law.

188. On the other hand, there is an immense social value to the interests threatened by Defendants' behavior, namely the health, safety, and welfare of HOWARD CENTER and its patients.

189. Defendants' behavior caused a substantial injury and damage to HOWARD CENTER.

190. Defendants' conduct fell below the reasonable standard of care and was negligent. Their negligent acts include:

a. Consciously oversupplying the market in and around the geographic areas served by HOWARD CENTER with highly-addictive prescription opioids;
b. Using unsafe distribution and dispensing practices;
c. Affirmatively enhancing the risk of harm from prescription opioids by failing to act as a last line of defense against diversion;

d. Disregarding precautionary measures built into Vermont, pharmacy board regulations, and applicable law;

e. Failing to properly train or investigate their employees;

f. Failing to properly review prescription orders for red flags;

g. Failing to report suspicious orders or refuse to fill them;

h. Failing to provide effective controls and procedures to guard against theft and diversion of controlled substances; and

i. Failing to police the integrity of their supply chains; and

j. Creating misleading information with the intention of having prescribers rely upon it.

191. Each Defendant had an ability to control the opioids at a time when it knew or should have known it was passing control of the opioids to an actor further down in the supply chain that was incompetent or acting illegally and should not be entrusted with the opioids.

192. Each Defendant sold prescription opioids in the supply chain knowing (a) there was a substantial likelihood many of the sales were for non-medical purposes and, (b) opioids are an inherently dangerous product when used for non-medical purposes, and (c) that every patient, before being prescribed even one opioid pill, needed to have a complete family history of addiction to alcohol and drugs, with any such history as a contraindication of any opioid use.

193. Defendants were negligent or reckless in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent or ameliorate such distinctive and significant dangers.

194. Controlled substances are dangerous commodities. Defendants breached their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of their business.

195. Defendants were also negligent or reckless in failing to guard against foreseeable third-party misconduct, *e.g.,* the foreseeable conduct of: corrupt prescribers, corrupt pharmacists and staff, and/or criminals who buy, dispense, and sell opioids for non-medical purposes.

196. Defendants are in a limited class of registrants authorized to legally distribute controlled substances. This places Defendants in a position of great trust and responsibility vis-a-vis HOWARD CENTER and its patient communities. Defendants owe a special duty to HOWARD CENTER. That duty cannot be delegated to another party.

197. HOWARD CENTER is without fault, and the injuries to HOWARD CENTER would not have happened in the ordinary course of events if the Defendants used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

198. The aforementioned conduct of Defendants proximately caused damage to HOWARD CENTER.

## **COUNT III: UNJUST ENRICHMENT**

199. Plaintiff reasserts the allegations of paragraphs 1 thru 170 as if set forth fully herein.

200. HOWARD CENTER has expended substantial amounts of money to address, remedy and/or mitigate the societal harms caused by Defendants' conduct.

201. The expenditures by HOWARD CENTER in providing treatment services to people who use opioids have added to Defendants' wealth. The expenditures by HOWARD CENTER have helped sustain Defendants' businesses.

202. HOWARD CENTER has conferred a benefit upon Defendants, by paying for what may be called Defendants' externalities - the costs of the harm caused by Defendants' negligent distribution and sales practices.

203. Defendants are aware of this obvious benefit, and that retention of this benefit is unjust.

204. Defendants made substantial profits while fueling the prescription drug epidemic in the geographic area served by HOWARD CENTER.

205. Defendants continue to receive considerable profits from the distribution of controlled substances in the geographic area serviced by HOWARD CENTER.

206. Defendants have been unjustly enriched by their negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

207. It would be inequitable to allow Defendants to retain the benefit or financial advantage of their wrongdoing.

208. HOWARD CENTER demands judgment against each Defendant for restitution, disgorgement, and any other relief allowed in law or equity.

## COUNT IV: COMMON LAW FRAUD

## (AS TO MANUFACTURER DEFENDANTS ONLY)

209. Plaintiff reasserts the allegations of paragraphs 1 thru 170 as if set forth fully herein.

210. Manufacturer Defendants engaged in false representations and concealments of material fact regarding the use of opioids to treat chronic non-cancer pain.

211. Manufacturer Defendants made and/or disseminated deceptive statements, including, but not limited to, the following: (a) advertising that opioids improved long-term functioning long-term and were suitable for the treatment of chronic non-cancer pain; (b)

promoting the concept of pseudo-addiction; (c) brochures concerning indicators of possible opioid abuse; (d) suitability of opioids for high-risk patients; (e) publications presenting an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs; (f) concealment of funding of pro-opioid KOL doctors regarding treatment for chronic non-cancer pain; (g) downplaying of the risks of opioid addiction; (h) CMEs promoting the use of opioids to treat chronic non-cancer pain; (i) promotion of misleading scientific studies regarding the safety and efficacy of opioids for long-term treatment of chronic non-cancer pain; (j) misuse and promotion of data to mask the true safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including rates of abuse and addiction and the lack of validation for long-term efficacy; (k) misleading statements in education materials for Vermont hospital doctors and staff under guise of educating them on new pain standards; (l) in-person detailing; and (m) withholding from Vermont law enforcement the names of prescribers believed to be facilitating the diversion of its products, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs.

212. Defendant Endo made and/or disseminated deceptive statements, including, but not limited to, the following: (a) false patient education materials; (b) advertising the ability of opioids to improve function long-term and the efficacy of opioids long-term for the treatment of chronic non-cancer pain; (c) promoting chronic opioid therapy as safe and effective for long term use for high- risk patients; (d) Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse; (e) concealing the true risk of addiction and promoting the misleading concept of pseudo-addiction; (f) promoting an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs; (g) secretly funding pro-opioid KOLs, who made deceptive

statements concerning the use of opioids to treat chronic non-cancer pain; (h) funding pro-opioid pain organizations responsible for egregious misrepresentations concerning the use of opioids to treat chronic non-cancer pain; (i) downplaying the risks of opioid addiction in the elderly; (j) CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain; (k) misleading scientific studies concluding opioids are safe and effective for the long-term treatment of chronic non-cancer pain and quality of life, while concealing contrary data; (l) funding and promoting pro-opioid KOLs concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudo-addiction; (m) manipulation of data regarding safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and (n) in-person detailing.

213. Defendant Janssen made and/or disseminated deceptive statements, including, but not limited to, the following: (a) patient education materials containing deceptive statements regarding the suitability, benefits, and efficacy of opioids; (b) stating that opioids were safe and effective for the long-term treatment of chronic non-cancer pain; (c) stating that opioids improve quality of life, while concealing contrary data; (d) concealing the true risk of addiction; (e) promoting the deceptive concept of pseudo-addiction; (f) promoting opioids for the treatment of conditions for which Janssen knew, due to the scientific studies it conducted, that opioids were not efficacious, and concealing this information; (g) presenting to the public and doctors an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs; (h) funding pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain; (i) funding pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain; (j)

using CMEs to promote false statements concerning the use of opioids to treat chronic non-cancer pain and; (k) in-person detailing.

214. Defendant Cephalon made and/or disseminated untrue, false, and deceptive statements minimizing the risk of addiction of opioids, promoting the concept of pseudo-addiction, advocating the use of opioids for chronic non-cancer pain, funding misleading CMEs, KOL doctors, and pain organizations, minimizing the addictiveness of Cephalon's potent rapid-onset opioids, and promoting the suitability of Cephalon's rapid-onset opioids to general practitioners, neurologists, sports medicine specialists, and workers' compensation programs.

215. Defendants Actavis and Mallinckrodt made and/or disseminated deceptive statements, including, but not limited to, the following: (a) promotion of use of opioids to treat chronic non-cancer pain to Vermont prescribers through in-person detailing; (b) advertising that opioids were safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improved quality of life; and (c) advertising that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain.

216. These false representations and concealments were reasonably calculated to deceive prescribing physicians in the geographic areas served by HOWARD CENTER, were made with the intent to deceive, and did, in fact, deceive physicians who prescribed opioids for chronic pain.

217. But for these false representations and concealments of material fact, HOWARD CENTER would not have incurred substantial costs and economic loss.

218. As a direct and proximate cause of the Manufacturer Defendants' fraudulent conduct, HOWARD CENTER has suffered damages.

## COUNT V: CIVIL CONSPIRACY

219. Plaintiff reasserts the allegations of paragraphs 1 through 170 as if fully set out herein.

220. The Manufacturer Defendants continuously supplied prescription opioids to the Distributor Defendants despite having actual or constructive knowledge that said Distributors were habitually breaching their duties under the law.

221. Without the Distributor Defendants' supply of prescription opioids, the Pharmacy Defendants would not be able to fill and dispense the increasing number of prescription opioids throughout the geographic areas served by HOWARD CENTER.

222. The Pharmacy Defendants continuously paid the Distributor Defendants to supply large quantities of prescription opioids in order to satisfy the demand for the drugs.

223. No Defendant in this opioid network would have succeeded in profiting so significantly from the opioid epidemic without the concerted conduct of the other party, and none would have succeeded so significantly without engaging in the wrongful conduct as herein alleged.

224. The Manufacturer Defendants likewise benefitted from this distribution conspiracy in that the more pervasive opioid diversion became, the more the Manufacturer Defendants profited. Despite access to the same information in the hands of the Distributor Defendants, the Manufacturer Defendants ignored the warning signs of opioid diversion.

225. As a result of the concerted actions between and among the Defendants, HOWARD CENTER has suffered damages.

226. HOWARD CENTER demands judgment against each Defendant for compensatory damages.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff HOWARD CENTER, Inc. prays that the Court grant the following relief:

(a) Injunctive Relief and abatement as against the Defendants for their wrongful, tortious, and illegal activities as alleged hereinabove;

(b) Compensatory, consequential, and incidental damages;

(c) All available equitable remedies, including restitution and disgorgement of revenue and profits;

(d) Punitive damages;

(e) Attorneys' fees and all costs and expenses related to this civil action; and

(f) All such other relief this Court and/or jury deems just and fair;

(g) Trial by jury for all counts so triable.

DATED 30th day of March 2020.

FRAZER PLC
Attorneys for Plaintiff Howard Center, Inc.

By: _/s/ T. Roe Frazer II_

T. Roe Frazer II
Patrick D. McMurtray
Thomas Roe Frazer III
FRAZER PLC
30 Burton Hills Blvd., Suite 450
Nashville, TN 37215
(615) 647-6464
roe@frazer.law
Patrick@frazer.law
trey@frazer.law

E. William Leckerling, Esq.
ERN: 1620
84 Pine Street, Suite 500
P.O. Box 728
Burlington, VT 05401
(802) 864-5756
wmleckerling@lisman.com

J. Nixon Daniel, III
Mary Jane Bass
John R. Zoesch, III
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL  32502
(850) 432-2451
jnd@beggslane.com
mjb@beggslane.com
jrz@beggslane.com